Attachment 6

Case 2:05-cv-00897-MEF-TFM    Document 8-8    Filed 11/07/2005    Page 1 of 16



70 FR 1659-01                                                          Page 1
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)

RULES and REGULATIONS

DEPARTMENT OF JUSTICE

Bureau of Prisons

28 CFR Part 570

[BOP Docket No. 1127-F]

RIN 1120-AB27

Community Confinement

Monday, January 10, 2005

AGENCY: Bureau of Prisons, Justice.

*1659 ACTION: Final rule.

SUMMARY: In this document, the Bureau of Prisons (Bureau) finalizes new rules regarding its categorical exercise of discretion for designating inmates to community confinement when serving terms of imprisonment.

DATES: This rule is effective on February 14, 2005.

FOR FURTHER INFORMATION CONTACT: Sarah Qureshi, Office of General Counsel, Bureau of Prisons, phone (202) 307-2105.

SUPPLEMENTARY INFORMATION: The Bureau published proposed rules on this subject on August 18, 2004 (69 FR 51213). In the proposed rule document, we explained that these rules would, as a matter of policy, limit the amount of time that inmates may spend in community confinement (including Community Corrections Centers (CCCs) and home confinement) to the last ten percent of the prison sentence being served, not to exceed six months. The only exceptions to this policy are for inmates in specific statutorily-created programs that authorize greater periods of community confinement (for example, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 FR 1659-01                                                                                    Page 2
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)

residential substance abuse treatment program (18 U.S.C. 3621(e)(2)(A)) or the shock incarceration program (18 U.S.C. 4046(c))). The Bureau announces these rules as a categorical exercise of discretion under 18 U.S.C. 3621(b).

We received 26 comments on the proposed rule. One commenter wrote in support of the rule as proposed. The remaining commenters raised similar issues, so we respond to each issue individually as follows.

Requests to hold a public hearing. Thirteen commenters requested the Bureau to hold a public hearing on the rule.

The Administrative Procedure Act (5 U.S.C. 551-559) does not require a hearing for rulemaking purposes unless a hearing is required by another statute. 5 U.S.C. 553(c). A hearing as described in 5 U.S.C. 556 is not required for this rulemaking by any other statute. Furthermore, we do not find that a hearing is necessary, as ample opportunity for written comment was given after publication of the proposed rule as required by the Administrative Procedure Act. See, e.g., United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742 (1972) (The Supreme Court held that the Interstate Commerce Commission was not required by statute to hold a hearing before rulemaking); See also Kelley v. Selin, 42 F.3d 1501 (6th Cir. 1995) (The court held that the Nuclear Regulatory Commission's (NRC) denial of a request for an adjudicatory hearing, was not arbitrary, capricious, or abuse of discretion, in light of the opportunity for public comment).

The rule has an unreasonable economic impact. Several commenters complained, both generally and specifically with regard to their particular community corrections business (CCCs), that the rule had an unfair economic impact. While we acknowledge that there has been an impact on some individual community corrections centers, we have observed no severe nationwide economic impact.

In the preamble to the proposed rule, we described the history of this change in our community confinement procedures as follows:

"Before December 2002, the Bureau operated under the theory that 18 U.S.C. 3621(b) created broad discretion to place inmates in any prison facilities, including CCCs, as the designated places to serve terms of 'imprisonment.' Under that theory, the Bureau generally accommodated judicial recommendations for initial CCC placements of non-violent, low-risk offenders serving short prison sentences. Consequently, before December 2002, it was possible for such inmates to serve their entire terms of 'imprisonment' in CCCs.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 FR 1659-01                                                                Page 3
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)

"On December 13, 2002, the Department of Justice's Office of Legal Counsel (OLC) issued a memorandum concluding that the Bureau could not, under 18 U.S.C. 3621(b), generally designate inmates to serve terms of imprisonment in CCCs. OLC concluded that, if the Bureau designated an offender to serve a term of imprisonment in a CCC, such designation unlawfully altered the actual sentence imposed by the court, transforming a term of imprisonment into a term of community confinement. OLC concluded that such alteration of a court-imposed sentence exceeds the Bureau's authority to designate a place of imprisonment. OLC further opined that if section 3621(b) were interpreted to authorize unlimited placements in CCCs, that would render meaningless the specific time limitations in 18 U.S.C. 3624(c), which limits the amount of time an offender sentenced to imprisonment may serve in community confinement to the last ten percent of the prison sentence being served, not to exceed six months. By memorandum dated December 16, 2002, the Deputy Attorney General adopted the OLC memorandum's analysis and directed the Bureau to conform its designation policy accordingly.

"Thus, effective December 20, 2002, the Bureau changed its CCC designation procedures by prohibiting Federal offenders sentenced to imprisonment from being initially placed into CCCs rather than prison facilities. The Bureau announced that, as part of its procedures change, it would no longer honor judicial recommendations to place inmates in CCCs for the imprisonment portions of their sentences. Rather, the Bureau would now limit CCC designations to pre-release programming only, during the last ten percent of the prison sentence being served, not to exceed six months, in accordance with 18 U.S.C. 3624(c)."

There has been a net effect of a 4.6 percent decrease in the CCC population since December 2002. In December 2002, when the Bureau changed its community confinement procedures in accordance with the OLC opinion, there was a 12-15 percent drop in CCC population from January-March 2003. The community confinement utilization patterns leveled off, however, and by the late summer of 2003, had begun to maintain only a 4-5 percent decrease in CCC population. The initial adverse impact on the CCC population has steadily improved and should continue to improve in the near future as industry readjustments are made. It is important to note that the finalization of this rule, therefore, will essentially have no further economic impact.

The rule will increase Bureau costs by increasing the number of inmates housed in penal facilities. Although we acknowledge that this change in the Bureau's CCC procedures will increase Bureau costs, we balance that cost against our interest in reaching a *1660 decision that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 FR 1659-01                                                            Page 4
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)

more accurately reflects the Bureau's mission, the text of 18 U.S.C. 3621(b), Congressional objectives reflected in related statutory provisions, and the policy determinations of the U.S. Sentencing Commission as expressed in the U.S. Sentencing Guidelines. We also note that the Bureau will be absorbing its own costs as necessary. As explained above, there will be only limited economic impact on small businesses and virtually no economic impact on any other entity.

The rule will not promote nationwide consistency in community confinement. As we stated in the preamble to the proposed rule, the rule will promote consistency in the Bureau's designation of inmates to places of confinement by eliminating inadvertent disparities that could arise under the previous process.

Congress, in enacting 18 U.S.C. 3621(b), codified its intent that the Bureau not show favoritism in making designation decisions: "In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status." 18 U.S.C. 3621(b). Indeed, eliminating unwarranted disparities in sentencing was a primary purpose of the Sentencing Reform Act of 1984. See S. Rep. No. 225, 98th Cong., 1st Sess. 52 (1983). However, the Bureau's system before December 2002, which allowed individualized CCC decisions for each inmate upon initial prison designation, created the possibility that it would unintentionally treat similar inmates differently.

These differences in treatment could not only be unfair to the inmates, but they "could invite [charges of intentional] favoritism, disunity, and inconsistency" against the Bureau. Lopez v. Davis, 531 U.S. 227, 244 (2001). This proposed rule promotes Congress' goal of eliminating unwarranted disparities in the sentencing and handling of inmates and also eliminates any concern that the Bureau might use community confinement to treat specific inmates or categories of inmates more leniently.

Consideration of factors under 18 U.S.C. 3621(b). Several commenters were concerned that the new rule "undermines the Bureau's statutory authority to make prisoner-specific determinations under § 3621(b)."

Section 3621(b) authorizes the Bureau to designate as the place of a prisoner's imprisonment any available facility that meets minimum standards of health and habitability "that the Bureau determines to be appropriate and suitable." 18 U.S.C. 3621(b). Section 3621(b) provides a nonexclusive list of factors that the Bureau is to consider in determining what facilities are "appropriate and suitable," including (1) the resources of the facility; (2) the nature and circumstances of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 FR 1659-01                                                                  Page 5
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)

the offense; (3) the history and characteristics of the prisoner; (4) any statement by the sentencing court about the purposes for which the sentence of imprisonment was determined to be warranted or recommending a type of penal or correctional facility as appropriate; and (5) any pertinent policy statement issued by the Sentencing Commission under 28 U.S.C. 994(a)(2). The Bureau will continue to evaluate these factors when making individual designations to appropriate Bureau facilities, and this rule will not adversely affect such individualized determinations.

The rule does not allow the Bureau to consider facility resources in making designation determinations. As we stated in the preamble to the proposed rule, the rules are consistent with 18 U.S.C. 3621(b)'s instruction that the Bureau consider facility resources in making designation determinations. 18 U.S.C. 3621(b)(1). Based on its experience, the Bureau has concluded that the resources of CCCs make them particularly well suited as placement options for the final portion of offenders' prison terms. This rule is based in part on a closer look at the particular characteristics and advantages of CCCs that make them best suited to particular inmates during the last ten percent of the prison sentence being served, not to exceed six months.

As Congress has itself recognized, those characteristics of CCCs mean that they "afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community." 18 U.S.C. 3624(c). By ensuring that offenders sentenced to prison terms not be placed in CCCs except during the last ten percent of their prison sentences (not to exceed six months), the new rule will help ensure that CCCs remain available to serve the purposes for which their resources make them best suited.

The rule is contrary to court precedent, the U.S. Sentencing Commission's Sentencing Guidelines and Congressional intent. This was a common theme among most of the comments. Commenters asserted that this rule is not consistent with the intent of existing law and Congress, and that federal courts have found this interpretation of the statute to be erroneous.

As we stated in the preamble to the proposed rule, some courts upheld the new community confinement practice, see, e.g., Cohn v. Federal Bureau of Prisons, 2004 WL 240570 (S.D.N.Y., Feb. 10, 2004); Benton v. Ashcroft, 273 F. Supp.2d 1139 (S.D. Cal. 2003); while others have rejected it, see, e.g., Monahan v. Winn, 276 F.Supp.2d 196 (D. Mass. 2003); Iacoboni v. United States, 251 F.Supp. 2d 1015 (D. Mass. 2003); Byrd v. Moore, 252 F.Supp.2d 293 (W.D.N.C. 2003).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
70 FR 1659-01                                                    Page 6
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)
```

Several courts that disagreed with the re-interpretation concluded that 18 U.S.C. 3621(b) grants the Bureau broad discretion to designate offenders to any facility, including CCCs. See, e.g., Iacaboni, 251 F. Supp. 2d at 1025; Byrd, 252 F. Supp. 2d at 300-01. See also Cohn, 2004 WL 240570 at *3 ("the BOP's interpretation that a CCC is not a place of imprisonment, and therefore not subject [to] Congress' general grant of discretion to the BOP under § 3621(b), is at a minimum a permissible interpretation of the statute").

Further, we acknowledge two cases decided subsequent to the publication of the proposed rule which disagreed with BOP's interpretation of 18 U.S.C. 3621(b) and 3624(c). Goldings v. Winn, 383 F.3d 17, 2004 WL 2005625 (1st Cir., Sept. 3, 2004) and Elwood v. Jeter, 386 F.3d 842, 2004 WL 2331643 (8th Cir., Oct. 18, 2004). The courts in both cases found that section 3621(b) authorizes the Bureau to place inmates in CCCs at anytime during service of the prison sentence, and that this authority is not limited by section 3624(c) to the last ten percent of the sentence being served, not to exceed six months. Both courts also found that CCCs are a place of imprisonment.

Nevertheless, both the Goldings and the Elwood courts held that section 3624(c) does not require placement in a CCC. It only obligates BOP to facilitate the prisoner's transition from the prison system. According to Elwood, 2004 WL 2331643 at *4, "this plan may include CCC placement, home confinement, drug or alcohol treatment, or any other plan that meets the obligation of a plan that addresses the prisoner's re-entry into the community." [Emphasis added.]

Section 3624(c) provides that, to the extent practicable, BOP shall assure a prisoner serving a term of imprisonment "spends a reasonable part, not to exceed six months, of the last ten percent of the term under conditions that will afford the prisoner a reasonable opportunity to adjust to and to prepare for the prisoner's re-entry into the community." [Emphasis added.]

Various courts have held that the Bureau has discretion under 18 U.S.C. 3621(b) to place offenders sentenced to a term of imprisonment in CCCs. Also, *1661 courts have acknowledged that the Bureau has discretion with regard to how it implements its mandatory pre-release custody obligation under § 3624(c). Courts have favorably acknowledged this rulemaking as an appropriate means of exercising the Bureau's authority under the governing statutes. See Richmond v. Scibana, 387 F.3rd 602, 605 (7th Cir. 2004).

Therefore, the Bureau considers it prudent to determine how to exercise such discretion to minimize the potential for disparity of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 FR 1659-01                                                      Page 7
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)

treatment. Accordingly, the Bureau has considered how to exercise that discretion in a manner consistent with the text of Section 3621(b), Congressional objectives reflected in related statutory provisions, and the policy determinations of the U.S. Sentencing Commission expressed in the U.S. Sentencing Guidelines. Based on those considerations, the Bureau has determined to exercise its discretion categorically to limit inmates' community confinement to the last ten percent of the prison sentence being served, not to exceed six months.

This rule is a proper means for the Bureau to exercise its available discretion through rulemaking. The determination to limit the amount of time that inmates may spend in community confinement (including Community Corrections Centers) and home confinement to the last ten percent of the prison sentence being served, not to exceed six months, is a rational and justifiable exercise of the Attorney General's discretion (as delegated to the Director, Bureau of Prisons). The Supreme Court has recognized that an agency head "has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." Lopez, 531 U.S. 230, 244, quoting American Hospital Assn. v. NLRB, 499 U.S. 606, 612 (1991) (agency may resolve disputes by industry-wide rule); see also, Yang v. INS, 79 F.3d 932, 936 (9th Cir. 1996).

The Supreme Court in Lopez, 531 U.S. at 231-32, upheld a Bureau rule that "categorically denies early release to prisoners whose current offense is a felony attended by "the carrying, possession, or use of a firearm."" The Bureau adopted that rule as an exercise of its discretionary authority, not as an interpretation of the statutory provisions. The Supreme Court held that the rule was a valid means for exercising discretion, and rejected plaintiffs' contention that the Bureau was required to adjudicate denials of early release on a case-by-case basis for each individual. [FN1] The present rule, like the Bureau rule in Lopez, makes a categorical exercise of the discretion available to the Attorney General by law. Congress has not "clearly express[ed] an intent to withhold" authority from the Attorney General to use rulemaking as a means of exercising that discretion.

FN1 The history of the Lopez litigation is also instructive. In 1995, the Bureau of Prisons published a rule to implement early release incentives, and that rule included a provision that all inmates who were incarcerated for "crime[s] of violence" were ineligible for early release. 60 FR 27692. The courts of appeals divided over the validity of the Bureau's definition of crimes of violence, specifically whether it would include drug offenses that involved possession of a firearm. This litigation prompted the Bureau

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 FR 1659-01                                                          Page 8
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)

to publish a revised version of the rule in 1997, and it was this revised rule that was actually before the Supreme Court in Lopez. See 62 FR 53690. The 1997 rule, like its predecessor, was designed to achieve consistent administration of the incentive program, and it provided that offenders were excluded from early release eligibility if they had possessed a firearm in connection with their offenses. However, the 1997 rule, unlike its predecessor, did not implement the exclusion by defining statutory terms; instead, the 1997 rule relied upon "the discretion allotted to the Director of the Bureau of Prisons in granting a sentence reduction to exclude [enumerated categories of] inmates." 62 FR 53690. The courts of appeals again split over the valiidity of the new rule, and the Supreme Court granted certiorari to resolve that circuit split. In its decision, the Supreme Court upheld the validity of the Bureau's new approach to limit the eligibility for early release by means of an exercise of discretion implemented by regulation.

The Bureau is not bound by U.S. Sentencing Commission Guidelines. Several commenters stated that the Bureau is not bound to make this rule by the U.S. Sentencing Commission's Sentencing Guidelines. While we acknowledge that we are not bound by the Guidelines, in our discretion, we consider it appropriate to analyze the Guidelines as one of many factors we considered in making this rule. The legislative history makes clear that, although the listed factors in 18 U.S.C. 3621(b) are "appropriate" for the Bureau to consider, Congress did not intend, by listing some considerations, "to restrict or limit the Bureau in the exercise of its existing discretion." S. Rep. 225, 98th Cong., 1st Sess. 142 (1983).

Therefore, in addition to the listed factors, the Bureau has determined that it is appropriate to consider the policies of the Sentencing Commission reflected in Sentencing Guidelines (as well as policy statements promulgated under 28 U.S.C. 994(a)(2)) and congressional policies reflected in related statutory provisions.

The Bureau has no empirical support for several of its assertions. Several commenters complained that the Bureau offered no data in support of two of its assertions:

1. In the preamble to the proposed rule, the Bureau stated that the system before December 2002, which allowed individualized CCC decisions for each inmate upon initial prison designation, created the possibility that it would unintentionally treat similar inmates differently, which "could invite [charges of intentional] favoritism, disunity, and inconsistency" against the Bureau. Lopez, 531 U.S. 227, 244.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 FR 1659-01                                                    Page 9
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)

2. In the preamble to the proposed rule, the Bureau stated that "a potential offender might reasonably perceive community confinement as a more lenient punishment than designation to a prison facility."

With regard to the first statement, we made no assertion that the Bureau had, in fact, treated inmates differently or shown favoritism. Rather, we stated that the previous procedures created the possibility that we would unintentionally treat similar inmates differently or, at least, the perception that such a possibility existed. We do not believe that a statement analyzing the previous situation requires empirical support. Further, 18 U.S.C. 3621(b) expressly states that "there shall be no favoritism given to prisoners of high social or economic status" in Bureau designation decisions. In making this rule, we mean to avoid both the possibility of violating the statute's mandate against favoritism and the appearance of such possible favoritism.

With regard to the second statement, we note that we do not routinely engage in gathering data regarding prisoners' perception. We do not believe that empirical data for this statement is necessary. The Bureau's experience with inmates and their families and victims has led us to the conclusion that placement in a CCC for reasons other than facilitating pre-release preparation may be perceived by the public and victims as diminishing the seriousness of the offense. If placement in a CCC diminishes the seriousness of the offense, the public and victims may perceive such placement as favoritism, which is expressly prohibited by statute.

The Bureau is exercising its discretion incorrectly or should exercise it differently to allow for greater opportunity for community confinement. Several commenters raised this issue. This rule is intended to inform inmates and the public of how the Bureau intends to exercise its discretion. Contrary to the commenters views, the Bureau is, through this rulemaking, choosing to exercise its discretion in a manner that is consistent with the statutes cited in the rule, as described above.

*1662 The Bureau should put detailed guidelines in the rule describing how the rule will be applied. One commenter requests the Bureau to state in rule text "detailed guidelines" on how the rule will be effected. Such detail pertaining to the rule text will be set forth as part of a Bureau policy statement, which is a more appropriate vehicle through which to provide added guidance to staff as to how inmates should be considered for pre-release programming.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 FR 1659-01                                                          Page 10
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)

　The proposed rule is unfair to federal inmates. One commenter complained that the rule is unfair to federal inmates because they "are required to do over 75 percent of their sentencing, while State inmates do less than half. State inmates are also allowed pardon and clemency while we have taken parole from the federal inmates."

　This rule is not meant to reach aspects of State systems of incarceration. The Bureau does not control State inmates and how much of their sentences they are required to serve. The Bureau may only exercise its discretion in the context of the federal system of incarceration, and chooses to do so as manifested in the language of this rule. Requiring federal inmates to serve their sentences in Bureau institutions more closely adheres to the spirit and intent of Federal criminal law. The Bureau simply enforces the laws enacted by Congress and implemented through the courts.

　The rule does not allow for inmates to have enough time to reintegrate into the community before release. Several commenters raised this concern. The Bureau strives to prepare inmates adequately and appropriately for release into the community on expiration of their sentence. When inmates near the end of their term of imprisonment, the Bureau engages its release preparation program to help assist them in re-establishing and/or maintaining community ties and otherwise re-integrating as a productive and law-abiding member of the community. The rule is consistent with congressional judgments as to the appropriate and reasonable amount of time to be spent in pre-release custody. 18 U.S.C. 3624(c).

　The Bureau incorrectly published the proposed rule without consulting Congress or attempting to revise the law. In making this rule, the Bureau has complied with all the rulemaking requirements in the Administrative Procedure Act (5 U.S.C. 551 et seq. Because no change to the statute was necessary, there was no need to address Congress and request a change to the United States Code.

　The Bureau failed to follow current law governing the rulemaking process. One commenter contends that the rule is procedurally defective for failure to follow requirements set forth in a number of Executive Orders. Our general response is that the rule is not procedurally defective in this regard because we complied with the requirements in these Executive Orders. However, we address each of the Executive Orders and other law that the commenter raised:

　Executive Order 12866, Regulatory Planning and Review, requires that agencies provide to the Office of Information and Regulatory Affairs (OIRA) within the Office of Management and Budget (OMB) an "assessment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 FR 1659-01                                                               Page 11
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)

of the potential costs and benefits of the regulatory action, including an explanation of the manner in which the regulatory action is consistent with a statutory mandate and, to the extent permitted by law, promotes the President's priorities and avoids undue interference with State, local, and tribal governments in the exercise of their governmental functions." E.O. 12866, Section 6(3)(B)(ii).

We provided such an assessment to OIRA, and in doing so have complied with the Executive Order. The preamble of the proposed rule provides sufficient statutory basis and contains no indication of undue influence on local governments. The rule is not procedurally defective for this reason.

Likewise, with regard to Executive Order 13132, we certified in the proposed rule that this regulation will not have substantial direct effects on the States, on the relationship between the national government and the States, or on distribution of power and responsibilities among the various levels of government. Therefore, under Executive Order 13132, we determined that this rule does not have sufficient Federalism implications to warrant the preparation of a Federalism Assessment. This rule is not procedurally defective for failure to so certify under E.O. 13132.

In the proposed rule, we certified that, under the Regulatory Flexibility Act (5 U.S.C. 605(b)), this regulation will not have a significant economic impact upon a substantial number of small entities. In the proposed rule, we stated that the economic impact of this rule is limited to Bureau appropriated funds. While we recognize that community confinement centers are sometimes small businesses, and that these small businesses will be impacted by this rule, the impact does not rise to the level of a "significant economic impact."

This rule is not a "major rule" as defined by section 804 of the Small Business Regulatory Enforcement Fairness Act of 1996. This rule will not result in an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

As we explained above, the 4.6 percentage decrease in the number of inmates in community confinement since the date of the change in the Bureau's community confinement procedures does not rise to an economic impact of $100,000,000 or more. Rather, the change in the Bureau's community confinement procedures had an economic impact resulting in a loss of $8 million annually (calculated based on a loss of revenue

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 FR 1659-01                                                                Page 12
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)

resulting from a 4.6 percent decrease in CCC population).

 E.O. 13198, issued on January 29, 2001, describes responsibilities of
a number of departments and offices within the Federal government with
regard to a "national effort to expand opportunities for faith-based
and other community organizations," but none of these are specific to
rulemaking. Section 6 of this E.O. only requires that "All Executive
Departments and Agencies" must designate an agency liaison to the
White House Office of Faith-Based and Community Initiatives (OFBCI)
and cooperate with the OFBCI as needed. These requirements do not
otherwise impact rulemaking. The Bureau has, therefore, not failed to
follow any rulemaking requirement under this E.O.

 Likewise, E.O. 13272, entitled "Proper Consideration of Small
Entities in Agency Rulemaking" heightens the need for compliance with
the Regulatory Flexibility Act, but does not appear to impose further
rulemaking procedural requirements. Again, the Bureau has not failed
to follow any rulemaking requirement under this E.O.

 Finally, another commenter claimed a violation of the Paperwork
Reduction Act, which requires all federal agencies to "minimize the
paperwork burden for individuals, small businesses, * * * resulting
from the collection of information by or for the Federal Government."
44 U.S.C. 3501(1). This rule does not include anything that could be
construed as a collection of information by or for the Federal
Government. The Bureau requires no paperwork or additional forms,
etc., from small businesses or any other non-federal entity as a
result of this *1663 rulemaking. The Paperwork Reduction Act, therefore,
was not violated by the proposed rule.

 Accordingly, we adopt the proposed rule as final, with only the
following change: We delete the word "pre-release" from § 570.21(b)
to allow for the possibility that Congress, in the future, may
statutorily identify programs which require CCC placement for other
than pre-release purposes. This minor deletion will allow the Bureau
to avoid unnecessarily limiting the rule's application.

 Executive Order 12866

 This rule falls within a category of actions that the Office of
Management and Budget (OMB) has determined to constitute "significant
regulatory actions" under section 3(f) of Executive Order 12866 and,
accordingly, it was reviewed by OMB.

 BOP has assessed the costs and benefits of this rule as required by
Executive Order 12866 Section 1(b)(6) and has made a reasoned

          © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
70 FR 1659-01                                                    Page 13
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)
```

determination that the benefits of this rule justify its costs. This rule will have the benefit of eliminating confusion in the courts that has been caused by the change in the Bureau's statutory interpretation, while allowing us to continue to operate under revised statutory interpretation. There will be no new costs associated with this rulemaking.

Executive Order 13132

This regulation will not have substantial direct effects on the States, on the relationship between the national government and the States, or on distribution of power and responsibilities among the various levels of government. Therefore, under Executive Order 13132, we determine that this rule does not have sufficient Federalism implications to warrant the preparation of a Federalism Assessment.

Regulatory Flexibility Act

The Director of the Bureau of Prisons, under the Regulatory Flexibility Act (5 U.S.C. 605(b)), reviewed this regulation and by approving it certifies that it will not have a significant economic impact upon a substantial number of small entities for the following reasons: This rule pertains to the correctional management of offenders committed to the custody of the Attorney General or the Director of the Bureau of Prisons, and its economic impact is limited to the Bureau's appropriated funds.

Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by § 804 of the Small Business Regulatory Enforcement Fairness Act of 1996. This rule will not result in an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
70 FR 1659-01                                                    Page 14
70 FR 1659-01, 2005 WL 34181 (F.R.)
(Cite as: 70 FR 1659)
```

List of Subjects in 28 CFR Part 570

Prisoners.

Harley G. Lappin,

Director, Bureau of Prisons.

Under rulemaking authority vested in the Attorney General in 5 U.S.C 301; 28 U.S.C. 509, 510 and delegated to the Director, Bureau of Prisons in 28 CFR 0.96, we revise 28 CFR part 570 as set forth below.

Subchapter D--Community Programs and Release

PART 570--COMMUNITY PROGRAMS

1. Revise the authority citation for 28 CFR part 570 to read as follows:

Authority: 5 U.S.C. 301; 18 U.S.C. 751, 3621, 3622, 3624, 4001, 4042, 4081, 4082 (Repealed in part as to offenses committed on or after November 1, 1987), 4161-4166, 5006-5024 (Repealed October 12, 1984, as to offenses committed after that date), 5039; 28 U.S.C. 509, 510.

28 CFR § 570.20

28 CFR § 570.21

2. Amend part 570 by adding subpart B consisting of § § 570.20 and 570.21 to read as follows:

Subpart B--Community Confinement

Sec.

570.20 What is the purpose of this subpart?

570.21 How will the Bureau decide when to designate inmates to community confinement?

28 CFR § 570.20

§ 570.20 What is the purpose of this subpart?

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 FR 1659-01  
70 FR 1659-01, 2005 WL 34181 (F.R.)  
(Cite as: 70 FR 1659)

Page 15

    (a) This subpart provides the Bureau of Prisons' (Bureau) categorical exercise of discretion for designating inmates to community confinement. The Bureau designates inmates to community confinement only as part of pre-release custody and programming which will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry into the community.

    (b) As discussed in this subpart, the term "community confinement" includes Community Corrections Centers (CCC) (also known as "halfway houses") and home confinement.

28 CFR § 570.21

§ 570.21 When will the Bureau designate inmates to community confinement?

    (a) The Bureau will designate inmates to community confinement only as part of pre-release custody and programming, during the last ten percent of the prison sentence being served, not to exceed six months.

    (b) We may exceed these time-frames only when specific Bureau programs allow greater periods of community confinement, as provided by separate statutory authority (for example, residential substance abuse treatment program (18 U.S.C. 3621(e)(2)(A)), or shock incarceration program (18 U.S.C. 4046(c)).

[FR Doc. 05-398 Filed 1-7-05; 8:45 am]

BILLING CODE 4410-05-P

70 FR 1659-01, 2005 WL 34181 (F.R.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.